# **<u>EXHIBIT D</u>**

# In The Matter Of:

## *Astra Aktiebolag*
## *vs.*
## *Andrx Pharmaceuticals, Inc.*

_____

## *Christine S. Meyer, Ph.D.*

## *July 30, 2013*

_____

## *\*HIGHLY CONFIDENTIAL\**
## *Under the Protective Order*

MERRILL CORPORATION
LegaLink, Inc.
311 South Wacker Drive
Suite 300
Chicago, IL 60606
Phone: 312.386.2000
Fax: 312.386.2275

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------x
ASTRA AKTIEBOLAG, et al.,

                Plaintiffs,

  vs.       Civil Action No.
                99-CIV-8926 (BSJ)
                99-CIV-9887 (BSJ)

ANDRX PHARMACEUTICALS, INC.,

                Defendant.
-------------------------------------------x

HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER

July 30, 2013

9:35 a.m.

      Videotaped deposition of CHRISTINE S. MEYER, PH.D, at the offices of Milbank, Tweed, Hadley & McCloy, One Chase Manhattan Plaza, New York, New York, before Nancy Mahoney, a Certified Court Reporter, Registered Professional Reporter, Certified LiveNote Reporter, and Notary Public within and for the States of New York and New Jersey.

Highly Confidential Under the Protective Order
Christine S. Meyer, Ph.D.    July 30, 2013

```
                                         2
 1  A P P E A R A N C E S:
 2  MILBANK, TWEED, HADLEY & McCLOY LLP
       Attorneys for Plaintiff and the Witness
 3        One Chase Manhattan Plaza
          New York, New York 10005
 4
    BY:  ERROL B. TAYLOR, ESQ.
 5        etaylor@milbank.com
         SURAJ K. BALUSU, ESQ.
 6        sbalusu@milbank.com
 7  WINSTON & STRAWN LLP
       Attorneys for Defendant
 8        35 West Wacker Drive
          Chicago, Illinois 60601-9703
 9
    BY:  JAMES HURST, ESQ.
10        jhurst@winston.com
         PETER J. SLAWNIAK, ESQ.
11        pslawniak@winston.com
12
13
14
15
16
17
18  ALSO PRESENT:
19     Robert Gibbs, Videographer
       Merrill Legal Solutions
20
21
22
23
24
25
```

```
                                         3
 1            I N D E X
 2
    WITNESS                             PAGE
 3
 4  CHRISTINE S. MEYER, PH.D.
 5     BY MR. HURST           6/326
 6     BY MR. TAYLOR          322
 7  PREVIOUSLY MARKED EXHIBITS:
 8  5010; 6022; 5008; 5009; 5012; 6023; 5002
 9         EXHIBIT INDEX
10  DESCRIPTION                         PAGE
11  (Deposition Meyer Exhibit 1 marked    10
    for identification, Curriculum Vitae
12  of Christine S. Meyer, Ph.D.)
    (Deposition Meyer Exhibit 2 marked    21
13  for identification, Expert Report of
    Dr. Christine S. Meyer, Ph.D., July
14  1, 2013.)
    (Deposition Meyer Exhibit 3 marked    47
15  for identification, Bates stamp ANDRX
    101539 through 101558.)
16  (Deposition Meyer Exhibit 4 marked    51
    for identification, Bates stamp ANDRX
17  215678 through 215701.)
    (Deposition Meyer Exhibit 5 marked   121
18  for identification, Settlement
    Agreement, Bates stamp AZD 217316
19  through 217346.)
    (Deposition Meyer Exhibit 6 marked   187
20  for identification, Expert Report of
    Dr. Christine S. Meyer, Ph.D., June
21  5, 2013, in the AstraZeneca v. Apotex
    litigation, Bates stamp AZD 999533
22  through 999623.)
23
24
25
```

```
                                         4
 1          EXHIBIT INDEX
 2  DESCRIPTION                         PAGE
 3
    (Deposition Meyer Exhibit 7 marked   198
 4  for identification, Prepared
    Statement of the Federal Trade
 5  Commission, July 23, 2013.)
    (Deposition Meyer Exhibit 8 marked   225
 6  for identification, Distribution
    Agreement, Bates stamp MEYER 000027
 7  through 000063.)
    (Deposition Meyer Exhibit 9 marked   312
 8  for identification, License
    Agreement, Bates stamp AZD 000191
 9  through 000332.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                         5
 1           THE VIDEOGRAPHER:  Good morning
 2  everyone.  This is the video operator speaking,
 3  Robert Gibbs of Merrill Legal Solutions of
 4  Chicago, 311 South Wacker Drive, Suite 300,
 5  Chicago, Illinois 60606.
 6           Today is July 30th, 2013, and the
 7  time is 9:38 a.m.  We are at the offices of
 8  Milbank, Tweed LLP, One Chase Manhattan Plaza,
 9  New York City, New York 10005, to take the
10  videotaped deposition of Ms. Christine Meyer in
11  the matter of Astra Aktiebolag, et al. versus
12  Andrx Pharmaceuticals, Inc., in the United
13  States District Court for the Southern District
14  of New York, Case Number 99-CIV-8926 (BSJ),
15  second Case Number 99-CIV-9887 (BSJ).
16           Will counsel please introduce
17  themselves for the record.
18           MR. TAYLOR:  Errol Taylor and Suraj
19  Balusu from Milbank for the plaintiffs.
20           MR. HURST:  Jim Hurst on behalf of
21  the defendants from Winston & Strawn.
22           MR. SLAWNIAK:  Pete Slawniak, also
23  on behalf of the defendants.
24           THE VIDEOGRAPHER:  Will the court
25  reporter, Nancy Mahoney of Merrill Legal
```

Highly Confidential Under the Protective Order
Christine S. Meyer, Ph.D.    July 30, 2013

## Page 6

1  Solutions, please swear the witness.
2          CHRISTINE S. MEYER, PH.D.,
3  having been first duly sworn by the Notary
4  Public (Nancy Mahoney), was examined and
5  testified as follows:
6          EXAMINATION BY MR. HURST:
7      Q.   Dr. Meyer, we've been introduced.
8  My name is Jim Hurst.  I'm going to be asking
9  questions today.  I take it, given your line of
10 business, that you've had your deposition taken
11 before?
12     A.   I have.
13     Q.   Approximately how many times?
14     A.   I would say somewhere between eight
15 and ten times.
16     Q.   So I know you know the ground
17 rules.  The only one I like to remind witnesses
18 about is talking at the same time because it
19 drives the court reporter nuts.  And almost
20 every deposition, I end up walking on a witness'
21 answer.  I'm going to try not to do that, and
22 you should probably try to do the same with
23 respect to my questions.
24          Fair enough?
25     A.   Fair enough.

## Page 7

1      Q.   All right.  How about trial
2  testimony, have you testified at trial?
3      A.   I have.
4      Q.   How many times?
5      A.   I don't know exactly.  It's in my
6  CV.  I would say on the order of half a dozen
7  times.
8      Q.   Have you ever testified at trial
9  relating to an appropriate royalty and/or lost
10 profits in a patent case?
11     A.   I have.
12     Q.   How many times?
13     A.   Again, I'd have to look at my CV to
14 be sure.  Certainly a couple of times come to
15 mind.
16     Q.   What comes to mind, what cases?
17     A.   As I'm sitting here today, a case
18 comes to mind involving Apotex and Merck;
19 additionally a case comes to mind involving a
20 company called Waddington.
21          In terms of trial testimony, I
22 can't think of any others that involve
23 specifically what you had said, reasonable
24 royalty or lost profits, but there could be
25 others.  I'd have to check my CV to be sure.

## Page 8

1      Q.   That's fine.
2           So in the Apotex versus Merck case,
3  or vice versa, Merck versus Apotex, whatever,
4  when did you testify and where did you testify?
5      A.   That case -- I testified earlier
6  this year in that case.  That was in Toronto,
7  Canada.
8      Q.   Under Canadian law?
9      A.   Correct.
10     Q.   Who did you testify for, which of
11 those two parties?
12     A.   My work was done on behalf of
13 Merck.
14     Q.   And the case involving the
15 Waddington -- I think you had said Waddington.
16          Is that correct?
17     A.   I believe I said Waddington, yes.
18     Q.   When and where did you testify in
19 that case?
20     A.   Again, it's all detailed in my CV.
21 I can't recall the exact date.  It was a couple
22 of years ago.  It was in New Jersey.
23     Q.   And who did you testify on behalf,
24 the patent owner or the accused infringers?
25     A.   This was on behalf of the

## Page 9

1  patentholder.
2      Q.   Have you ever testified on behalf
3  of an accused infringer at trial in connection
4  with the appropriate level of damages?
5      A.   I have testified on behalf of
6  defendants at trial in terms of the appropriate
7  level of damages.
8      Q.   That wasn't my question.
9           My question is:  Have you ever
10 testified on behalf of an accused infringer in a
11 patent case at trial?
12     A.   Again, without having my CV in
13 front of me, I can't -- I would want to look
14 back and be sure.  As I said before, I've
15 testified on behalf of defendants in terms of
16 damages.  I can't recall, as I sit here today, a
17 specific case in which I testified on behalf of
18 an accused infringer.  I certainly have worked
19 with cases for defendants in patent cases.  I
20 just can't recall a specific trial testimony
21 that is exactly, you know, what your -- what I
22 believe your question was.
23     Q.   Did you have trouble understanding
24 the question?
25     A.   I didn't have trouble understanding

3 (Pages 6 to 9)

Highly Confidential Under the Protective Order
Christine S. Meyer, Ph.D.    July 30, 2013

```
                                                          70
 1  it which describes why --
 2        (Multiple speakers.)
 3     Q.   I'm just directing you where I'm
 4  going to read.
 5     A.   I see -- I see that phrase that
 6  you -- that you mentioned.
 7     Q.   The assumed license can be
 8  structured as having two components with
 9  separate royalties for each.  And then you have
10  a selling component and a manufacturing
11  component, right?
12     A.   A license to sell infringing
13  omeprazole products at a defined future date and
14  a license to manufacture pre-launch inventory of
15  those products prior to that date.
16     Q.   Okay.  So you have a sale component
17  and a manufacturing component in this license
18  agreement, right?
19     A.   Yes, that's correct.
20     Q.   All right.  And on what date -- in
21  this license agreement that you assumed the
22  parties would have reached, on what date would
23  Andrx be permitted to sell the material that it
24  manufactured under the manufacturing component
25  of the agreement?
```

```
                                                          71
 1     A.   Under the -- if -- if the
 2  validation batches are found to be infringing
 3  and the hypothetical negotiation was in
 4  September, I would have to double check on the
 5  date, but it's roughly five months later they
 6  would be allowed to sell.
 7        And then con -- or in addition, if
 8  the hypothetical negotiation date is in November
 9  of 2001, then the license to sell would be four
10  months later, so approximately March of 2002.
11     Q.   Okay.  So under the -- under the
12  later of your two hypothetical negotiation
13  dates, this license agreement would give Andrx
14  the right to sell in about March of 2002, yes?
15     A.   That's about correct, yes.
16     Q.   And under what terms would Andrx be
17  permitted to sell under your hypothetical
18  license agreement?
19     A.   I have not looked at that or
20  considered that and it wasn't necessary for the
21  question that I was asked, which was to isolate
22  a reasonable royalty for the manufacture
23  portion.  So it wasn't necessary to look at the
24  subsequent license agreement.
25     Q.   But you assumed that Andrx, upon
```

```
                                                          72
 1  selling that product, would have to pay some
 2  reasonable royalty, right?
 3     A.   Again, yes, I would assume that
 4  there would be some license agreement in place,
 5  but exactly what that license agreement looked
 6  like, I haven't made any assumptions in that
 7  regard.
 8     Q.   Did you have a range in mind about
 9  what Andrx would have to pay upon the sale of
10  the product that it manufactured prior to March
11  of 2002, did you have a range for reasonable
12  royalty?
13     A.   Again, no, there was no reason for
14  me to specifically analyze what a number or
15  range would be for that.  That's not what I was
16  asked to do.  That's not what the -- the nature
17  of the infringement.
18        I was asked to address specifically
19  the nature of the infringement and the royalty
20  that would be appropriate for the infringement
21  in question.
22     Q.   In this hypothetical license
23  agreement where Andrx had the right to sell in
24  March of 2002, did you at least contemplate that
25  the reasonable royalty that Andrx would have to
```

```
                                                          73
 1  pay upon that sale was more or less than, let's
 2  say, 50 percent of profits?
 3     A.   I really have not -- I really can't
 4  answer that.  I haven't -- and I think I spell
 5  this out clearly in the report and I think in my
 6  previous questions.  It wasn't relevant to the
 7  question that I was asked to -- to opine on, it
 8  wasn't relevant to the particular infringement
 9  for which I was asked to provide a reasonable
10  royalty.  So I have not -- I don't have an
11  opinion on that.
12     Q.   Do you know -- is there a typical
13  royalty range that you're aware of for
14  pharmaceutical formulation patents that is known
15  in the industry, is there a typical royalty rate
16  for pharmaceutical formulation patents?
17     A.   You know, my under -- based on my
18  work in licenses and royalties is that each case
19  is individual, and you really can't say there's
20  a typical rate.
21     Q.   Do you -- are you aware -- can you
22  think of a -- strike that.
23        Have you ever worked on a case
24  where you had to come up with a reasonable
25  royalty for a pharmaceutical formulation patent?
```

19 (Pages 70 to 73)

Highly Confidential Under the Protective Order
Christine S. Meyer, Ph.D.    July 30, 2013

74

1  A.  Yes.
2  Q.  And what case was that that you're
3  thinking of?
4  A.  I think there were several cases in
5  which formulation patents were at issue. I'm
6  trying to think if there was a formulation
7  patent in the Merck case that I mentioned
8  before. I know there have been formulation
9  patents in other cases, but I would -- I would
10 really have to think about -- you know, go back
11 and think about those cases.
12     I -- you know, I would have to go
13 back and look at the specifics of the case.
14 Q.  Would -- do you remember the
15 opinion you held on what a reasonable royalty
16 would be for the pharmaceutical formulation
17 patent at issue in the Merck case?
18 A.  I don't recall the details of the
19 reasonable royalty in that case, no.
20 Q.  Do you remember whether it was
21 higher or lower than 50 percent of the generic's
22 profits?
23 A.  You know, there were -- that
24 case -- in that case -- I mean, part of it is
25 that there -- you know, I just want to be

75

1  careful. There are confidentiality issues that
2  I want to make sure that I'm not, you know,
3  disclosing.
4      I know there -- you know, there was
5  some complications in that case, as there always
6  are, and my recollection was I had some various
7  scenarios and -- and some of them involved, you
8  know -- I can't recall what percentage of
9  profits those involved. I really can't. I
10 just -- I do recall that there were a number of
11 different scenarios.
12 Q.  But you don't know whether it was
13 higher or lower than 50 percent of the generic's
14 profits?
15 A.  I believe there were at least some
16 scenarios in which it was higher than 50 percent
17 of the profits, but there could have been some
18 that were lower. I just don't recall.
19 Q.  And so Andrx manufactured about 80
20 or so non-validation batches before March of
21 2002, this date that you said they would be
22 permitted to sell.
23     Does that sound about right to you,
24 about 80?
25 A.  I would really have to go back and

76

1  look at that number. I really just don't know
2  off the top of my head.
3  Q.  Okay. So you've come up with an
4  amount that Andrx would have to pay for the
5  right to manufacture those pre-March 2002
6  batches, right?
7  A.  This would be a license to
8  manufacture ahead of the sale in March of 2002.
9  Q.  Sure.
10     And the amount that you've offered
11 an opinion on, if you include both validation
12 and non-validation batches, is, you know,
13 approximately 140 million or so, right?
14 A.  140 million batches?
15 Q.  $140 million, your opinion.
16 A.  Oh, my reasonable royalty?
17 Q.  Yeah.
18 A.  Under the assumption that the
19 validation batches are infringing, it was about
20 143 million or so, yes.
21 Q.  143, okay.
22     So under your hypothetical license
23 agreement, Andrx pays 143 million for the right
24 to manufacture these validation and
25 non-validation batches, right?

77

1  A.  That's correct.
2  Q.  And when Andrx sells the product
3  from those validation and non-validation
4  batches, Andrx pays again upon the sale of those
5  batches, right?
6  A.  Again, I generally assume that
7  there would be an additional royalty on the
8  sales, but -- certainly a license to cover those
9  sales. How exactly that license would be
10 structured, I don't have an opinion and I
11 haven't really considered that. I didn't need
12 to consider that for purposes of this report.
13 Q.  But why would you need to consider
14 it, because how could Andrx know whether it
15 would be profitable to enter into this deal
16 where they pay $143 million upfront without
17 knowing how much they were going to have to pay
18 to Astra when they sold those same batches?
19 A.  Because the question that I was
20 asked to answer here is simply: What is the --
21 the reasonable royalty for the pre-launch
22 manufacture? And so I was able to isolate that
23 by looking at the incremental value to Andrx
24 and, of course, considering also the cost to
25 Astra of the incremental -- the incremental

20 (Pages 74 to 77)

Highly Confidential Under the Protective Order
Christine S. Meyer, Ph.D.   July 30, 2013

Page 78

1  value of manufacturing prior to sale.
2        And so that was something that I
3  was able to isolate, and -- and that's what I
4  did.
5     Q.   Okay.  So, as I understood your
6  opinion, you were basically -- as in all patent
7  licenses, there's essentially a profit split,
8  right, some goes to the patent owner and some
9  goes to the accused infringer, right?
10    A.   Again, this actually comes back to
11 a question that you had asked previously.  A
12 reasonable -- in a reasonable royalty setting,
13 sometimes the reasonable royalty can be even
14 higher than the infringer's profits or the
15 infringer's expected profits or what -- I'm not
16 sure which of those two you were thinking about.
17 It could be higher than either/or both of those.
18       And so there are times in which one
19 can think about the --
20    Q.   That's fine.  I withdraw the
21 question.
22    A.   -- reasonable royalty --
23    Q.   I withdraw the question.
24       Okay.  So in your opinion, you've
25 divided the expected profits from the sale of

Page 79

1  these validation and non-validation batches, 75
2  to Astra, 25 to Andrx, right?
3     A.   Well, that's not how I would
4  characterize it at all.  I mean, I think I -- I
5  characterize it the way I would characterize it
6  in the report, which is the incremental value --
7  I looked at the incremental value of receiving a
8  license -- I should clarify -- Andrx receiving a
9  license to manufacture ahead of launch and what
10 the incremental value of that license would be.
11    Q.   But when they -- how much revenue
12 would Andrx generate from the sale of the
13 validation and non-validation batches we were
14 looking at, how much revenue would they
15 generate?
16    A.   I haven't calculated that specific
17 number.
18    Q.   Once they pay off 140 million,
19 would there be any left over for Andrx, in your
20 view?
21    A.   I haven't -- I mean, I'm not sure
22 exactly what question you're asking.
23       In terms of after they paid this
24 royalty would there still be some amount left of
25 the incremental benefit that Andrx received from

Page 80

1  pre-launch manufacture, the answer to that
2  question is yes.
3        I'm not sure -- I really didn't
4  quite follow the question that you asked, but
5  the -- you know, the --
6        (Multiple speakers.)
7     A.   -- if there's any relevant
8  question, that would be the relevant question.
9     Q.   Let me with -- let me withdraw it.
10       So -- so say -- when Andrx, in your
11 hypothetical world, sells the validation and
12 non-validation batches we're discussing, they
13 would generate revenue, right?
14    A.   If Andrx were to sell product, I
15 assume that they receive revenue from selling
16 product.
17    Q.   Sure.
18       And from that revenue, they would
19 pay $143 million to Astra, right, in your view?
20    A.   Well, I don't know about the -- the
21 part that I -- I don't think is -- is correct is
22 the sort of -- that the from that revenue, sort
23 of tying a particular revenue.
24       I mean, the question was the -- and
25 the analysis was the full incremental benefit of

Page 81

1  manufacturing early, that some of that would
2  have been generated by the revenue on particular
3  sales and some would have been generated by the
4  revenue on other sales.
5        So I -- to sort of tie to it
6  particular revenues is where I'm having
7  difficulty with your question.
8     Q.   Go to Page 25 of your report.  You
9  have a chart.  I want to look at the -- I guess
10 I'll just look at the row called Including
11 Validation Batches.
12       Do you see that?
13    A.   I see the row Including Validation
14 Batches, yes.
15    Q.   So you calculated the incremental
16 benefit of a manufacturing license to Andrx
17 would be about $190 million, right?
18    A.   I think you said that right.  The
19 incremental value of a manufacturing license
20 would be $190 million, yes.
21    Q.   And so -- and you proposed that
22 Andrx -- of that 190 million dollar benefit, you
23 proposed that Andrx would pay to Astra about 143
24 million, right?
25    A.   I -- I -- the reasonable royalty

21 (Pages 78 to 81)

Highly Confidential Under the Protective Order
Christine S. Meyer, Ph.D.    July 30, 2013

Page 82

1  under the scenario of including validation
2  batches I found to be about 143 million.
3      Q.   And so that --
4      A.   But that's -- I mean, yes, that's
5  what I found.  Not paying out of something,
6  but --
7      Q.   Sure.
8           And that would leave still a
9  benefit to Andrx of -- if you subtracted the 143
10 million from the 190 million, you'd still get a
11 benefit of about $38 million to Andrx, right?
12     A.   There would -- it would be probably
13 more like 40, 40 million plus.
14     Q.   Did I do the math wrong?  Yeah, 48
15 million, 48 million.  Sorry -- wait, wait.
16     A.   143.
17     Q.   143.  So, yeah.
18     A.   So in terms of simply looking
19 here --
20     Q.   Let me -- just because I messed up
21 the math, I want to ask the question again,
22 okay?
23     A.   That's fine.
24     Q.   Yeah.
25          So on Page 25, you have an

Page 83

1  incremental benefit to Andrx of about 190
2  million from this manufacturing license that
3  you've hypothesized, right?
4      A.   That's correct.
5      Q.   And the reasonable royalty you
6  propose that Andrx would pay to Astra would be
7  approximately 143 million, right?
8      A.   That's correct.
9      Q.   And so even after paying that
10 reasonable royalty to Astra, under your
11 analysis, Andrx would still have a benefit of
12 about $47 million, right?
13     A.   Again --
14     Q.   About.
15     A.   If you look at the difference
16 between the 190 million dollar incremental
17 benefit that this manufacturing license would
18 give to Andrx and the amount of royalty that
19 they have to pay based on the reasonable
20 royalty, then the difference is 47 -- around 47
21 million or so.  I'll take your word for the math
22 on that.
23     Q.   You don't have an opinion on how
24 much it would actually have cost Andrx to
25 actually sell the product that it manufactured

Page 84

1  under the manufacturing component of the
2  license, right?
3      A.   I'm sorry, say that again.
4      Q.   You have not offered an opinion in
5  this case about how much it would actually cost
6  Andrx to sell the product that it made under the
7  manufacturing component of the license, right?
8      A.   Again, I think I was clear.  There
9  were two parts to the license, and the only part
10 that I needed to specifically value in order to
11 come up with a reasonable royalty for the
12 infringement was the manufacturing portion.  I
13 haven't offered an opinion on what the rest of
14 the license would look like.  And I think that
15 was your question.
16     Q.   It was.
17          So what I'm saying is if the rest
18 of the license costs a hundred million dollars,
19 your proposed deal would be entirely
20 unprofitable for Andrx, right?
21     A.   Can you say that again?
22     Q.   Yeah.
23          If the manufacturing component
24 costs 143 million and hypothetically the sales
25 component costs, let's say, a hundred million,

Page 85

1  your proposed hypothetical deal would be
2  unprofitable for Andrx, right?
3      A.   Well, considering the fact that
4  they expected to make one-and-a-half billion
5  dollars, no, I don't think that would have been
6  unprofitable at all.  That would have been --
7  that would have been a very profitable license
8  for them.
9      Q.   Yeah, but why wouldn't they just
10 forego the manufacturing component all together?
11 The manufacturing component would actually cost
12 them more money than it made them, wouldn't it?
13     A.   No, I don't think so.  I mean, what
14 you -- you were talking about having -- I mean,
15 I'm not sure where you're -- you know, which
16 numbers you're thinking about, but in terms of
17 their expectation of profitability -- and this
18 is only over the first five years -- I believe
19 it's the first five years -- was one-and-a-half
20 billion dollars in profits, more or less.  And
21 maybe I even have that number wrong, but I think
22 that's about right.
23          So I'm not sure why you think the
24 license that you just set out would be
25 unprofitable for Andrx.  I don't understand

22 (Pages 82 to 85)

Highly Confidential Under the Protective Order
Christine S. Meyer, Ph.D.   July 30, 2013

86

1  that.
2  **Q.  Well --**
3  A.  It seems very profitable for me.
4  **Q.  For the sale of the product -- all**
5  **I'm saying is, for the sale of the product made**
6  **under the manufacturing component, if it costs**
7  **them 143 million for that -- to make that -- to**
8  **make that product, right, isn't it possible that**
9  **the sales component would swamp any profits they**
10 **earned from making those lots?**
11 A.  But the critical thing to
12 understand here is we're not just talking
13 about -- we're talking about the -- the head
14 start, right, the -- or, as I think one of the
15 witnesses talked about, a running start versus a
16 standing start for getting into this opportunity
17 sooner and being able to maximize this
18 opportunity.  And this is the total benefit that
19 accrues over the course of the entire five
20 years, but it has to do -- it's the incremental
21 value of the man -- of the ability to
22 manufacture early, but I don't -- and that's
23 where I -- I have trouble with you sort of, you
24 know, linking one piece to another piece.
25      I mean, you have to look at the

87

1  totality of the opportunity here was to make --
2  this incremental benefit was worth 190 million
3  to Andrx, and it would then -- the reasonable
4  royalty that I found would still leave it with
5  the considerable profit on this incremental
6  piece, even if it pays the reasonable royalty
7  that I have opined on.
8  **Q.  In a rational world, aren't the**
9  **manufacturing component and the sales component**
10 **of your hypothetical license linked to one**
11 **another?**
12 A.  I'm not sure what you mean by
13 linked to one another.
14 **Q.  Let me say -- let me try to explain**
15 **that.**
16 **If you're required to pay more**
17 **upfront for the manufacturing component, doesn't**
18 **it stand to reason that you would therefore want**
19 **to pay less for the sales component?**
20 A.  Well, I think someone who's paying
21 royalties always wants to pay less, I'm assuming
22 that.
23      What -- what I can do with the --
24 the approach that I've looked at is I can
25 actually isolate the incremental value of the

88

1  manufacturing component.  That's exactly what I
2  did.
3       So that's why I'm -- I'm not sure
4  what you mean by linked.  There is a -- there is
5  a way -- and I've done it and it's, you know,
6  quite straightforward -- of how to actually
7  think about the incremental value of the
8  manufacturing component, and that's what I've
9  done.
10 **Q.  Would Andrx have entered a deal, in**
11 **your view, where it only got the manufacturing**
12 **component of the license but did not get the**
13 **sales component at all?**
14 A.  I -- again, what I looked at was
15 what I thought was a reasonable way to structure
16 a hypothetical negotiation in this construct.  I
17 don't know -- you know, I'd have to think
18 about -- I'm not sure why you would manufacture
19 without being able to sell, but maybe there
20 would be another way for them to sell.  I mean,
21 that's -- but I assume you manufacture in order
22 to be able to sell.
23 **Q.  So is it fair to say, therefore,**
24 **that if Andrx -- strike that.**
25      **So is it fair to say that if Astra**

89

1  **only offered the manufacturing component of the**
2  **deal but did not offer the sales component of**
3  **your hypothetical license, that Andrx would have**
4  **said no to the deal?**
5  A.  Again, I'm not sure -- I'm not sure
6  whether they would have or would not have.  I'm
7  not sure if there would have been, you know,
8  ways for them to then sell that manufactured
9  inventory on, for example, but I'm not assuming
10 that in this case.
11      What I'm assuming is a situation
12 which there is, as I -- as I stated in the
13 report, a license to manufacture and a license
14 to sell and I'm able to isolate the
15 manufacturing component.
16 **Q.  Can you think of any rational**
17 **reason -- as you sit here today, can you think**
18 **of any rational reason for Andrx to have**
19 **accepted a 143 million dollar proposed royalty**
20 **to manufacture if it didn't simultaneously get**
21 **the right to sell product from Astra?**
22 A.  I mean, if it could have -- I guess
23 I -- the question is, you know, is it -- well,
24 one question is:  Is it selling it itself, can
25 it -- can it sell that product to someone else

Highly Confidential Under the Protective Order
Christine S. Meyer, Ph.D.   July 30, 2013

90

1  that does have, let's say, the right for
2  whatever reason to sell it into the marketplace?
3       Again, I'm assuming -- and I think
4  this makes sense in terms of the license that
5  we're talking about here is to have a license
6  that includes both a manufacturing component and
7  a selling component.
8       Q.   Dr. Meyer, the only value of the
9  manufacturing component of your hypothetical
10 license is the fact that you can sell it -- the
11 product later and make a profit, right?
12      A.   The value of the manufacturing
13 component is the increased profit that you would
14 make from -- increased, you know, in terms of
15 comparing two possible worlds:  One is which --
16 in which you sell, you know, four or five months
17 after the hypothetical negotiation, and one --
18 another one in which you're delayed.  So it's --
19 it's the incremental value of being able to sell
20 earlier.
21      Q.   Okay.  So now I'm going to ask you
22 to assume that Andrx did not get the right to
23 sell the validation and non-validation batches
24 to anybody, it didn't get that right in this
25 hypothetical negotiation, okay.  That's what I'm

91

1  asking you to assume.  Do you understand the
2  assumption I'm asking you to make?
3       A.   I believe so.
4       Q.   If under that assumption -- strike
5  that.
6            If Andrx did not get the right
7  through this hypothetical license to sell its
8  product to anybody, can you think of any
9  rational reason for Andrx to agree to pay $143
10 million for the right to manufacture its
11 validation and non-validation batches?
12      A.   Again, I just want to make sure
13 that I'm clear on -- on what you're asking.
14           Are you saying that Andrx knows
15 that at the time that it's entering into this
16 license, it affirmatively knows that it can't
17 sell --
18      Q.   Right.
19      A.   -- or it still has possibilities or
20 probabilities of selling?
21      Q.   You understand that when you enter
22 into -- strike that.
23           You understand that for a
24 reasonable royalty opinion, you have to assume
25 that the patent is both infringed and valid?

92

1       A.   I understand that.
2       Q.   And, therefore, yes, in this
3  hypothetical negotiation, I'm assuming that
4  Andrx has to assume that the patent is both
5  valid and infringed and, therefore, it cannot
6  sell its product absent a license from Astra.
7  Do you understand the assumption I'm asking you
8  to make?
9       A.   I understand the assumption.
10      Q.   Okay.  With the assumption that
11 Astra declines to give Andrx any right to sell
12 its product, can you think of any rational
13 reason for Andrx to agree to pay any royalty,
14 much less $143 million, for the mere right to
15 make product?
16      A.   Well, in that case, I don't
17 understand -- then we wouldn't be here, because
18 in that case, if Andrx knows that it can't sell,
19 then I don't see why it would have manufactured
20 in the first place; but the fact is, in this
21 case, as I understand it, there has been
22 infringement, and the infringement is due to the
23 manufacture.
24           So the hypothetical that you pose,
25 I would agree that Andrx wouldn't pay, but I

93

1  would also say that there would be no
2  infringement, there would be no -- I think what
3  I'm following is that there would be no
4  manufacture, but that's not the situation we
5  have here.  We have a situation in which there
6  was manufacture and that manufacturer was
7  infringing, so it doesn't -- it doesn't get us
8  anywhere in terms of the question, which is
9  what's a reasonable royalty for the manufacture.
10      Q.   I'm not totally sure I follow what
11 you just said, so I'm going to try to clarify.
12           With the assumption -- whether you
13 agree whether it's a good assumption or a bad
14 assumption, okay, with the assumption that Astra
15 would not give, in this hypothetical
16 negotiation, Andrx the right to sell its product
17 to anybody, you agree, don't you, that,
18 therefore, Andrx would not agree to pay any
19 royalty, much less $143 million for the mere
20 right to manufacture the product?  You agree
21 with that, don't you?
22      A.   And I think, as I just stated a
23 moment ago, if -- if Andrx knew for sure that it
24 could not sell its product, I don't think it
25 would have manufactured the product and I

24 (Pages 90 to 93)

Highly Confidential Under the Protective Order
Christine S. Meyer, Ph.D.    July 30, 2013

## 94

1  don't -- and, therefore, it wouldn't have made
2  sense to pay a royalty for something that you
3  didn't do, but that's -- that is irrelevant,
4  actually, to the question at hand.
5      Q.   Well, it's not.  You understand
6  that the real world is different from the
7  hypothetical negotiation.  In the real world,
8  Andrx thought the patent was both not infringed
9  and invalid; though a court disagreed, Andrx
10 believed the patent was both non-infringed and
11 invalid; you understand that, right?
12     A.   I'm not sure what Andrx's specific
13 thinking on, you know, whether it was invalid or
14 non-infringed or the probabilities of those
15 things occurring actually were.
16     Q.   You understood, though, it was
17 challenging both the validity, infringement of
18 the patent in court; you understood that, right?
19     A.   I generally understand that to be
20 the case.
21     Q.   Right.
22     A.   But I don't have a detailed
23 understanding of the -- of the liabilities
24 portion of the case.
25     Q.   And that's the real world.  In the

## 95

1  hypothetical -- and that's why it manufactured
2  its product, it was hoping to win the patent
3  case, right?  You understand that, right?
4      A.   I would think that it was
5  manufacturing the product in the hopes of
6  winning the patent case, yes.
7      Q.   Right.
8           And now -- and so that's why it
9  manufactured its product in the real world.
10 Now, but in the hypothetical negotiation world,
11 it has to assume it's going to lose the patent
12 case, it has to assume the patent is both valid
13 and infringed.
14          You understand that, right?
15     A.   In the hypothetical negotiation, we
16 always assume a valid and infringed patent,
17 that's correct.
18     Q.   Right, right.
19          So given that, you agree, don't
20 you, that Andrx, if it didn't get the sales
21 component of your hypothetical license
22 agreement, if it had no right to sell the
23 product, it certainly wouldn't pay any royalty,
24 much less 100 million plus royalty for the mere
25 right to manufacture alone, would it?

## 96

1      A.   And, again, this is --
2      Q.   Would it?  Yes or no.
3      A.   It would neither manufacture nor
4  pay, but it wouldn't manufacture.  And so then
5  we -- that doesn't really -- that's not relevant
6  to the question at hand.
7      Q.   Well, it is, actually.
8           It's true, isn't it, that -- that
9  Andrx couldn't make any money from the
10 manufacturing component of your hypothetical
11 license agreement alone, right?
12     A.   I -- as I show with the modeling,
13 it expected to make considerable money as a
14 result of getting the manufacturing component of
15 the license.
16     Q.   Through the sales, right, that's
17 how it made its money, by selling the product,
18 right?
19     A.   It's the incremental profits that
20 are coming from the incremental sales, but
21 they -- they are derived from the ability to
22 manufacture early.
23     Q.   That's what I'm trying to focus on.
24 Without the sales component and with only the
25 manufacturing component, Andrx couldn't make any

## 97

1  money on the batches it manufactured, true?
2      A.   But, again, I think we just went
3  through why it doesn't make sense to -- to think
4  about a license with a -- and that's why I did
5  think about a license with a manufacturing
6  component and a sales component.
7      Q.   Okay.  But -- so, but you agree --
8  whether you think it's an unreasonable
9  assumption or not, you agree that from the
10 manufacturing component of your hypothetical
11 license agreement alone, from just the
12 manufacturing component, Andrx couldn't make any
13 money?
14     A.   Well, that's where I -- that's
15 where I disagree, because it does -- I mean, the
16 point here is that in the -- in the license that
17 I have set up for the hypothetical negotiation,
18 it does make incremental profits as a result of
19 the manufacturing component of the license.
20     Q.   Only through the sales component.
21 I'm saying without the sales component, you
22 agree that Andrx can't make any money from the
23 manufacturing component alone, true?
24     A.   And --
25     Q.   True?

25 (Pages 94 to 97)

Highly Confidential Under the Protective Order
Christine S. Meyer, Ph.D.    July 30, 2013

98

1    A.   And what I'm saying -- and I think
2  I'm trying to be very careful on this, but
3  without -- you know, without the sales
4  component, they never would have manufactured in
5  the first place in the way that you're
6  describing.  And so then I'm not sure what that
7  even tells us about anything in this case.
8    Q.   Well, in the real world, Andrx did
9  manufacture and it didn't sell, right?
10    A.   You were talking quickly now, I
11  just want to make sure, could you repeat that?
12    Q.   In the real world, Andrx made both
13  validation and non-validation batches, true?
14    A.   I understand that to be the case.
15    Q.   And in the real world, Andrx didn't
16  actually sell any product, correct?
17    A.   Well, Andrx -- I mean, as far as I
18  know, they didn't sell any product sort of
19  around this point in time.  Yeah, I do
20  understand that they sold product later on in
21  time, but around this time I don't -- I haven't
22  seen any evidence that they sold any product.
23    Q.   Meaning before the expiration of
24  the patent, they didn't sell any product, right?
25    A.   That's correct, I was referring to

99

1  the expiration.
2    Q.   And so in the real world, did Andrx
3  make any money from the manufacturing that
4  occurred before your proposed selling date of
5  March 2002?
6    A.   Although that's irrelevant to my
7  analysis, my understanding is that Andrx did
8  not -- at least I haven't seen any evidence that
9  Andrx sold or made any profits from those
10  particular batches.
11    Q.   They actually lost money from
12  making those validation and non-validation
13  batches, given the court's ruling on
14  infringement and validity, correct?
15    A.   I'm not sure what you mean by they
16  lost money.
17    Q.   Well, it cost them money to make
18  the batches and they didn't make any money back,
19  so they lost money?
20    A.   Andrx certainly spent money on --
21  on making those batches, yes.
22    Q.   And it was a write-off that they
23  had to take in the neighborhood of tens of
24  millions of dollars.  Are you aware of that?
25    A.   I don't know the exact amount, but

100

1  it -- it shows me that this was an opportunity
2  that was worth quite a bit because Andrx was
3  willing to invest, I think you characterize it,
4  as tens of millions of dollars into this.
5    Q.   And in the real world, since they
6  did manufacture but they didn't get a right to
7  sell, can't we just look at that scenario to
8  show that Andrx would never pay a penny for just
9  the right to manufacturing without the right to
10  sell?
11    A.   I -- I don't understand your
12  question at all.
13    Q.   Given what happened in the real
14  world where Andrx made batches and lost money
15  because it couldn't sell, doesn't that lead you
16  to the conclusion that Andrx would never pay any
17  reasonable royalty for the right to manufacture
18  alone without the right to sell?
19    A.   Well, I think there -- there are
20  about sort of three -- at least three different
21  components to your question.
22        I mean, first of all, in the real
23  world, they did spend money to manufacture, as
24  you had -- you said it was something on tens of
25  millions of dollars, without actually having a

101

1  license to sell.  So I -- I disagree with that
2  part of the premise of your question.
3        But the -- the question here really
4  has to do with the hypothetical negotiation.
5  And I think as -- as we've walked through
6  before, it doesn't make sense to think about --
7  I mean, what makes sense is the -- is the
8  license that I have set up in which there's a
9  manufacturing component and a sales component
10  because the -- because of the question that I
11  was asked, which is:  What's a reasonable
12  royalty for the manufacture?  And the -- and the
13  manufacture was the actual infringing
14  infringement that I understand occurred in this
15  case.
16    Q.   How many times in your lifetime
17  have you been asked to determine appropriate
18  royalty for a patent license, approximately?
19    A.   I don't know, probably -- I'm not
20  sure.  25, 30 times, maybe, maybe more than
21  that.
22    Q.   Have you been asked to offer an
23  opinion on the right to merely make the accused
24  product without the right to sell the product
25  later?  Have you ever been asked to do that?

26 (Pages 98 to 101)

Highly Confidential Under the Protective Order
Christine S. Meyer, Ph.D.    July 30, 2013

102

1   A.  I have to think, you know, through
2  all the -- the cases and the -- as you said, the
3  times that I've been asked to -- to think about
4  a reasonable royalty.  I mean, they're all --
5  they're all individual cases, but the framework
6  is all the same in really all of those cases,
7  which is, as I've done here, to think about the
8  incremental benefits and costs of the license.
9       In terms of, you know, has there
10 been a case that I've worked on that has, you
11 know, the specific fact pattern here?  I would
12 say, you know, to the best of my recollection, I
13 mean, every case is different, I can't think of
14 one that had the particular fact pattern here.
15 But -- but the methodology is the same that I've
16 used in -- in, you know, pretty much all the
17 cases that I've worked on.
18   Q.  **My question is a little more**
19 **precise.**
20      **Can you think of an instance where**
21 **you were asked to opine on a situation where the**
22 **accused infringer was given the license to**
23 **manufacture the product but was not given a**
24 **license to sell the product, can you think of an**
25 **instance where you actually were asked to do**

103

1  **that?**
2   A.  And that's, I think, the question
3  that I -- that I just answered, which was, you
4  know, I've worked on a lot of cases in which
5  patent licenses were, you know, either front and
6  center or -- or were a component, and there's
7  a -- there's a common methodology to doing that.
8       And you're asking me, I think, for,
9  you know, was there a case in which the fact
10 pattern and, as you described, the manufacturing
11 component as it was here.  I can't think of a
12 case that had, you know, a fact pattern
13 specifically like this, but -- but in terms of,
14 you know, the methodology, that would be the
15 same no matter what the fact pattern would be.
16   Q.  **My -- actually my hypothetical is**
17 **not like this case because in this case you were**
18 **asked to provide an opinion on a reasonable**
19 **royalty where the accused infringer is given the**
20 **right to manufacture and sell, right, you have**
21 **both components in your hypothetical license**
22 **agreement, both a manufacturing component and a**
23 **selling component, right?**
24   A.  I have a manufacturing component
25 and a selling component in my -- in my -- the

104

1  license under the hypothetical negotiation.
2  What I was asked to do was -- and I think this
3  is spelled out in --
4   Q.  Let me withdraw the question.
5       And so my question to you is:  **Have**
6  **you ever been in your lifetime asked to offer an**
7  **opinion on what an appropriate royalty would be**
8  **to give the accused infringer the right to make**
9  **the accused product but then have no ability to**
10 **sell the accused product; have you ever been**
11 **asked to offer an opinion on that scenario?**
12  A.  I cannot -- again, as I said, I
13 think I've said this a couple of times and --
14 and maybe we're just understanding the question
15 differently, but --
16  Q.  **You can't think of a situation?**
17  A.  -- I can't -- I can't think of a
18 situation in which, you know, counsel asked me
19 the specific question that you're -- that you're
20 just posing to me.
21  Q.  Okay.  And, in fact, I mean, under
22 the patent code, there's separate -- with
23 respect to reasonable royalty, there's a
24 reasonable royalty for making, using and
25 selling.  You've heard of those phrase -- those

105

1  three phrases used in connection with the
2  reasonably royalty:  Making, using and selling?
3   A.  I've heard those three phrases --
4  those three words used in connection with a
5  reasonable -- with patent law generally and
6  infringement.
7   Q.  **Are you aware of any article, any**
8  **case, anything from your experience where**
9  **somebody opines on the right to make the accused**
10 **product without having the right to sell what**
11 **the accused infringer just made?  Are you aware**
12 **of any article, any case, any literature where**
13 **it's only the right to make the product but not**
14 **sell the product?**
15  A.  You know, I guess when I -- when I
16 look at -- you're talking about articles.  A
17 couple questions you had, you had articles and
18 literature.
19      I mean, the articles and literature
20 that I've seen speak about the methodology of
21 reasonable royalty.  Each case is different.
22 And so the methodology is the same.  The
23 specific facts of what the infringement was or
24 what the benefits and the costs are are going to
25 be different, but -- but typically I haven't